256 April 24, 2014 No. 23

IN THE SUPREME COURT OF THE
STATE OF OREGON

Elspeth McCANN,
*Petitioner,*

*v.*

Ellen ROSENBLUM,
Attorney General, State of Oregon,
*Respondent.*

Paul ROMAIN
and Ronald R. Dodge,
*Petitioners,*

*v.*

Ellen ROSENBLUM,
Attorney General, State of Oregon,
*Respondent.*

Lauren G. R. JOHNSON
and Lynn T. Gust,
*Petitioners,*

*v.*

Ellen ROSENBLUM,
Attorney General, State of Oregon,
*Respondent.*

(SC S062082 (Control), S062083, S062084)

En Banc

On petitions to review ballot title filed March 3, 2014; considered and under advisement on April 8, 2014.

Steven C. Berman, Stoll Stoll Berne Lokting & Shlachter, PC, Portland, filed the petition for review on behalf of petitioner McCann.

Paul R. Romain, The Romain Group, LLC, Portland, filed the petition for review on behalf of petitioners Romain and Dodge. With him on the petition was Margaret E. Schroeder, Black Helterline, LLP, Portland.

John A. DiLorenzo, Jr., Davis Wright Tremaine LLP, Portland, filed the petition for review on behalf of petitioners Johnson and Gust.

Matthew J. Lysne, Senior Assistant Attorney General, Salem, filed the answering memorandum. With him on the memorandum were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

KISTLER, J.

Ballot title referred to the Attorney General for modification.

**KISTLER, J.**

In this consolidated ballot title case, three sets of petitioners have asked us to review the ballot title for Initiative Petition 47 (2014). *See* ORS 250.085(2) (specifying who may petition for review of certified ballot titles).[1] We review ballot titles for substantial compliance with ORS 250.035(2). *See* ORS 250.085(5) (stating standard of review). For the reasons explained below, we refer the ballot title to the Attorney General for modification.

Initiative Petition 47 (IP 47), if enacted, would change the way that liquor is sold in Oregon. Currently, the Oregon Liquor Control Commission (OLCC) governs the retail sale of liquor for off-premises consumption. ORS 471.730; ORS 471.750. The OLCC appoints private business owners as agents to operate state-licensed retail liquor stores. ORS 471.750. The OLCC essentially acts as a middleman between wholesale liquor distributors and retail OLCC liquor stores; specifically, the OLCC purchases liquor from wholesale distributors, marks up the wholesale price, and then sells the liquor at the marked-up price to the OLCC retail stores. ORS 471.730; ORS 471.745; ORS 471.750. The revenue that the OLCC collects as a result of that markup, less administrative costs, is distributed to the state general fund and also to counties and cities. ORS 471.805; ORS 471.810.

IP 47 would eliminate the current system of state-licensed liquor stores and allow "holders of distilled liquor self-distribution permits" (essentially wholesalers) to distribute liquor to "qualified retailers," who would, in turn, sell the liquor to the public. Those retailers would include private stores with at least 10,000 square feet of store space as well as smaller private stores that meet certain other requirements. Among other changes, IP 47 would create a new administrative agency, the Oregon Distilled Liquor Board (ODLB), establish regulatory requirements for wholesalers and qualified retailers, dispose of OLCC property, and wind down contracts and agreements between OLCC-licensed liquor stores and the OLCC.

---

[1] McCann filed the petition in S062082; Romain and Dodge, the petition in S062083; and Johnson and Gust, the petition in S062084. We refer to each set of petitioners respectively as McCann, Romain, and Johnson.

IP 47 also would replace the current markup system with a "revenue replacement fee" on wholesalers. IP 47, § 16. As noted, the OLCC sells liquor it purchases from wholesalers to state-licensed liquor stores at a marked-up price. *See* ORS 471.745; ORS 471.750(2). Currently, the marked-up price is roughly 180 percent of the wholesale cost plus certain administrative costs. *See* ORS 471.730; OAR 845-015-0138.[2] If IP 47 became law, wholesalers would sell directly to retailers, eliminating the OLCC markup. To replace the revenue from the markup, wholesalers would pay the OLCC a "revenue replacement fee" equal to 71.7% of the wholesale price of the liquor, plus a small fee per container. IP 47, § 16(1). Those fees would not be imposed directly on the retailer or the consumer, although the wholesaler could pass some or all of those fees on to the retailer who, in turn, could pass them on to the consumer.

The goal of IP 47's "revenue replacement fee" is to maintain roughly the same level of revenue for the state's general fund, counties, and cities that the current markup system provides.[3] IP 47 implicitly recognizes, however, that it may be difficult to predict whether the revenue generated by the new "revenue replacement fee" will match the revenue generated by the current markup system. Specifically, IP 47 provides for a one-time adjustment to the 71.7% fee. *See* IP 47, §§ 73, 80. IP 47 provides that, if the proposed measure becomes law, a "Legislative Revenue Officer" will determine in 2016 whether the amount of revenue generated by the revenue replacement fee between July 1, 2015 and June 30, 2016 (the "2015 tax year") falls within an acceptable range. *Id.* § 73. If the amount of revenue generated by the revenue replacement fee during the 2015 tax year

---

[2] According to OLCC documentation that McCann attached to her petition, the marked-up price for a bottle of liquor is calculated as follows: If a case of liquor costs more than $78, the OLCC adds $14.45 to the wholesale cost of the case, multiplies the sum by 1.798, adds an outbound freight cost of $1.40 to that product, and divides the total by the number of bottles in the container, rounding up to the nearest nickel.

[3] Most of the revenue generated by the revenue replacement fee would be available for the same general government uses that revenue from the current markup is; IP 47, however, dedicates small amounts of revenue from the sale of each container to a few specified funds, such as funds to pay the costs of the ODLB and to support law enforcement. *See* IP 47, §§ 26-28.

is less than $190,791,582 or more than $194,645,958, then IP 47 directs the legislative revenue officer to determine in 2016 the rate that, if applied to wholesale sales in the 2015 tax year, would have generated a revenue replacement fee of $192,718,770. *Id.* That adjusted rate will apply to all future wholesale sales; the section of IP 47 that authorizes a rate adjustment in 2016 will be automatically repealed on January 1, 2017. *Id.* § 80.

The Attorney General certified the following ballot title:

**"Allows qualified retail stores to sell liquor; imposes taxes similar to current state price markup**

"**Result of 'Yes' Vote**:   'Yes' vote expands retail sales of liquor by qualified retailers; imposes taxes roughly comparable to current state markup; establishes regulatory requirements for sales and distribution.

"**Result of 'No' Vote**:   'No' vote retains the current system of retail sales of liquor exclusively through Oregon Liquor Control Commission agents, retains state markup for costs and taxes.

"**Summary**:   Under current law, retail sales of liquor by the bottle are made exclusively by retail sale agents of the Oregon Liquor Control Commission (OLCC). Price determined by multiplying cost/case by 1.798, adding operation and other costs. Measure would expand the number of retailers; current agreements with retail sales agents would be terminated, subject to a right to continue to operate. Current beer/wine retailers over 10,000 square feet would qualify as liquor retailers, provided they are in compliance with all liquor laws and have successfully completed the responsible vendor program. Current markup of prices replaced by 71.7% tax, plus per bottle tax; taxes adjusted in 2017; establishes minimum price. Creates Oregon Distilled Liquor Board to encourage industry; OLCC retains regulatory functions. Other provisions."

Petitioners McCann, Romain, and Johnson have raised various challenges to the caption, results statements, and summary. We write to address two of those challenges, both of which concern the ballot title's description of the "revenue replacement fee." The first challenge concerns the use of the word "tax" rather than "fee" throughout the ballot

title to describe the revenue replacement fee. The second challenge concerns the use of the phrases "similar to" and "roughly comparable to" in, respectively, the caption and the "yes" vote result statement.

We begin with the Attorney General's decision to use the word "tax" rather than the word "fee" to describe the "revenue replacement fee" that IP 47 would impose on wholesalers. Relying on *Bernard v. Keisling*, 317 Or 591, 858 P2d 1309 (1993), petitioner Johnson argues that the ballot title should use the same term that the ballot measure does, unless compelling reasons exist to use a different term. In *Bernard*, the court upheld the Attorney General's use of the term "fee" rather than "tax" because the ballot measure had used that term and because the Attorney General's use of that term "substantially complied" with his obligation to describe the subject matter and major effect of the proposed measure. *Id.* at 596-97. The court explained, however, that the Attorney General could use a different term than the measure did if doing so were necessary to describe the measure accurately. *Id.* at 597. Since *Bernard*, we have considered on more than one occasion when the Attorney General may or must go beyond the words of a measure to describe either its subject matter or its effects. *See, e.g., Caruthers v. Myers*, 344 Or 596, 602-03, 189 P3d 1 (2008) (considering the appropriate ballot title when federal law clearly preempted part of the measure but did not clearly preempt the remainder); *Wolf v. Myers*, 343 Or 494, 500-01, 173 P3d 812 (2007) (recognizing that drafting a ballot title can require some level of interpretation of the measure).

In this case, if the Attorney General had used the word "fee" to describe the "revenue replacement fee," her use of that word would have raised substantial questions. The money that wholesalers must remit to the OLCC has more attributes of a tax than a fee. A tax is "any contribution imposed by government upon individuals, for the use and service of the state." *Automobile Club v. State of Oregon*, 314 Or 479, 485-86, 840 P2d 674 (1992). A fee, by contrast, is imposed on persons who apply for or receive a government service that directly benefits them. *Id.*; *see Qwest Corp. v. City of Surprise*, 434 F3d 1176, 1182 (9th Cir 2006) (explaining that the distinction between a tax and a fee is whether

the "charge is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed").

It does not appear that much, if any, of the "revenue replacement fee" that wholesalers would pay under IP 47 would be used to provide services that directly benefit wholesalers. *See id.* Rather, under IP 47, much of the money that wholesalers would pay the state would be distributed, as it currently is, to the state's general fund, cities, and counties and would be available for general government use. That distribution scheme has more attributes of a tax than a fee. *See Automobile Club*, 314 Or at 485-86 (defining the attributes of a tax). Indeed, describing the money paid to the state by wholesalers as a "fee" would imply inaccurately that the uses to which that money could be put are far more limited than IP 47 contemplates.

We recognize that a ballot title challenge ordinarily is not the appropriate forum for deciding legal issues that require interpretation of a proposed measure. *See Bernard,* 317 Or at 595 (stating rule). For that reason, we need not determine conclusively the character of the revenue at issue here. Rather, the question is whether the Attorney General's use of the word "taxes" to describe the charge that wholesalers would pay under IP 47 "substantially complies" with her obligation to describe the measure accurately. It does. Indeed, the use of the word "taxes" is more defensible than the use of the word "fees" to describe that aspect of IP 47.

Johnson raises a related but separate concern. She reasons that the use of the word "taxes" in the caption is confusing because it may cause voters to think that consumers will have to pay a sales tax on liquor when, in fact, the tax will fall on wholesalers. Johnson's point is an interesting one. We agree with Johnson that the tax (or fee) that IP 47 imposes is not a "sales tax," as that term is ordinarily understood. It is not a tax that consumers are responsible for paying. We recognize, however, that a tax on wholesalers may be passed on, in whole or in part, to retailers who, in turn, may pass it on to consumers. In that respect, although responsibility for paying the tax falls on wholesalers, the tax burden ultimately may fall on consumers.

Although one might question, as an economic matter, who will ultimately bear the tax burden, we agree with Johnson that the word "taxes," without more, is misleading because it does not identify who is responsible initially for paying the tax. *See McCann / Harmon v. Rosenblum*, 354 Or 701, 706-07, 320 P3d 548 (2014) (holding that a caption may be misleading where its description of a tax is unnecessarily generalized). Because wholesalers are required to pay IP 47's "revenue replacement" tax initially, the word "taxes" should be modified to indicate that fact. One way of doing so would be to describe it as a "wholesale tax."[4]

We turn now to the second objection, which petitioners McCann and Romain raise to the caption and the "yes" vote result statement. They argue that the taxes that IP 47 would impose are not "similar to" or "roughly comparable to" the current state price markup. We begin with the caption, which states: "Allows qualified retail stores to sell liquor; imposes taxes similar to current state price markup."

Petitioner McCann argues that the phrase "similar to" promises too much. She reasons that, even if the drafters of IP 47 sought to generate an amount of revenue similar to the amount the current markup system generates, the proposed tax will not necessarily accomplish that goal. She reasons that whether a tax (or fee) on wholesale sales will generate equivalent revenue will depend on the volume of wholesale sales and the wholesale sale prices in a particular year. Although the measure provides for a one-time adjustment to the wholesale tax rate, and thus seeks to achieve equivalent revenue that way, she contends that a one-time rate adjustment based on wholesale sales in the 2015 tax year does not ensure that the revenue generated in later years will be the same. McCann reasons that, if wholesale liquor sales and prices in later tax years vary substantially from those in the 2015 tax year, then the adjusted rate will produce substantially more or substantially less revenue than the adjusted rate would have produced in the 2015 tax year (and than the markup system currently produces).

_____

[4] We note that a pending ballot title for Initiative Petition 58 (2014) uses similar wording to indicate that wholesalers will pay the tax. Care should be taken, however, to avoid suggesting that the wholesale tax is a sales tax that would fall initially on consumers.

Petitioner Romain argues that "similar to" is inaccurate for a different reason. He contends that the sections of IP 47 permitting a "legislative revenue officer" to adjust the tax rate and exempting in-state liquor distillers from taxes imposed on out-of-state distillers are unconstitutional and not severable. It follows, he argues, that the "revenue replacement fee" will generate no revenue for the state. For that reason, he contends, the revenue generated by the new system will not be "similar to" the revenue generated by the current markup system.

The Attorney General responds that the caption does not state that IP 47 will be revenue neutral, as the proponents of the measure have argued. Rather, the caption states only that IP 47 "imposes taxes similar to current state price markup." The Attorney General reasons that "similar to" is close enough, given the rate adjustment mechanism that IP 47 provides. She also argues that a ballot title should not speculate on whether a proposed measure will be held unconstitutional, if the measure passes.

We agree with the Attorney General that it would not be appropriate for her to opine, at this stage of the process, whether the two sections of the ballot measure that Romain identifies are unconstitutional and, if so, whether they are severable. To be sure, a tax exemption for in-state distillers might be difficult to defend against a Commerce Clause challenge. *See Bacchus Imports, LTD. v. Dias*, 468 US 263, 104 S Ct 3049, 82 L Ed 2d 200 (1984). However, the other constitutional issue that Romain raises is less certain, and Romain's argument ultimately depends not only on whether the two provisions would be held unconstitutional but also on whether they would be severable. In this posture, we cannot fault the Attorney General for declining to factor those complex legal determinations into her description of the measure's effects. *Compare Sizemore v. Myers*, 326 Or 220, 231, 953 P2d 360 (1997) (declining to engage in "extensive legal interpretation" of the relationship between the proposed ballot measure and other constitutional provisions), *with Caruthers*, 344 Or at 601 (referring the ballot title for modification when the legal effect of the measure was undisputed).

The issue that McCann raises is more problematic. The phrase "imposes taxes similar to current state price markup" implies that the revenue generated by IP 47 will be "similar to" the revenue generated by the current system. We assume that the revenue identified in section 73 of IP 47 reflects the annual revenue produced under the current system; that is, we assume that the current system generates revenue ranging from $190,791,582 to $194,645,958 per year. *See* IP 47, § 73 (stating that range as the "target" that the revenue generated by IP 47 should meet).[5] The difficulty, however, lies in predicting whether the new system will generate similar amounts of revenue annually. As McCann notes, the prediction that it will do so rests on an assumption about the volume of wholesale sales that will occur under the new system as well as the wholesale prices that will be charged under that system. However, unless and until IP 47 goes into effect, those assumptions are just that.

It is true, as the Attorney General notes, that IP 47 provides for a one-time adjustment to the wholesale tax rate. If the voters approve IP 47 and if the revenue produced by the measure during the 2015 tax year falls below $190,791,582 or exceeds $194,645,958, IP 47 provides that the legislative revenue officer will determine in 2016 the wholesale tax rate that would have generated $192,718,770 in revenue for the 2015 tax year. That adjusted tax rate will then apply to all future tax years. However, whether that adjusted tax rate will generate similar revenue in future years turns on whether wholesale sales and wholesale prices remain constant. If wholesale sales or wholesale prices for the 2015 tax year are atypical, then the one-time adjustment that IP 47 provides could result in greater discrepancies between the revenue generated by the "revenue replacement fee" and the current markup system.

A hypothetical will illustrate the problem. Suppose that IP 47 passes and that wholesale liquor sales increase exponentially during the 2015 tax year as new retail sales outlets stock their shelves for the first time. Suppose also

---

[5] Petitioner Johnson represents that those figures reflect the "approximate total current revenues raised by the Oregon Liquor Control Commission from the sale of alcohol under the status quo." No party disputes that representation.

that wholesale prices remain constant, even though experience teaches that prices often rise as demand increases. Substantially increased wholesale sales could lead to revenue for the 2015 tax year that greatly exceeds $194,645,958 and thus could lead to a corresponding reduction in the wholesale tax rate. Even though wholesale sales for the 2015 tax year might be atypically high, the reduced tax rate would continue to apply to wholesale sales in all future tax years, thereby reducing the revenue the state receives below that generated by the current markup system. Instead of correcting any discrepancy in the revenue generated by the two systems, the one-time adjustment that IP 47 provides could instead exacerbate it.

For that reason, we agree with McCann that the phrase "similar to" in the caption is not accurate. The phrase "similar to" promises more than IP 47 may be able to deliver. For the same reason, we agree with McCann that the phrase "roughly comparable to" in the "yes" vote result statement is not accurate. We accordingly refer the caption and the "yes" vote result statement to the Attorney General for modification. We have considered the other challenges that McCann, Romain, and Johnson raise to the certified ballot title. In light of the difficulties that the Attorney General faced in trying to describe accurately and succinctly the extensive changes that IP 47 would effect, we cannot say that the remainder of the ballot title does not substantially comply with her statutory obligations.

Ballot title referred to Attorney General for modification.