No. 25          July 16, 2015          437

IN THE SUPREME COURT OF THE
STATE OF OREGON

ROGUE VALLEY SEWER SERVICES,
an Oregon municipality,
*Petitioner on Review,*

*v.*

CITY OF PHOENIX,
an Oregon municipality,
*Respondent on Review.*

(CC 103450E2; CA A148968; SC S062277)

On review from the Court of Appeals.*

Argued and submitted February 15, 2015.

Tommy A. Brooks, Cable Huston, LLP, Portland, argued the cause and filed the briefs for petitioner on review. With him on the brief were Casey M. Nokes and Clark I. Balfour.

J. Ryan Kirchoff, James Holmbeck Kirchoff, LLC, Grants Pass, argued the cause and filed the brief for respondent on review. With him on the brief was Kurt H. Knudsen, Jacksonville.

C. Robert Steringer, Harrang Long Gary Rudnick P.C., Portland, filed the brief for *amici curiae* Clackamas River Water and Special Districts Association of Oregon.

Harry Auerbach, Chief Deputy City Attorney, Portland, argued the cause for *amicus curiae* League of Oregon Cities. Chad A. Jacobs, Beery, Elsner & Hammond, LLP, Portland, filed the brief for *amicus curiae* League of Oregon Cities. With him on the brief were Harry Auerbach, Portland, and Sean E. O'Day, Salem.

H. M. Zamudio, Huycke O'Connor Jarvis, LLP., Medford, filed the brief for *amicus curiae* City of Central Point.

––––––––––––––
* Appeal from Jackson County Circuit Court, G. Philip Arnold, Judge. 262 Or App 183, 329 P3d 1 (2014).

Before Balmer, Chief Justice, and Kistler, Walters, Linder, Landau, and Baldwin, Justices,**

BALMER, C. J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____

** Brewer, J., did not participate in the consideration or decision of this case.

**BALMER, C. J.**

In this declaratory judgment action, we consider whether a home-rule city can impose a five percent franchise fee on a sanitary authority with overlapping jurisdiction. The trial court concluded that the city had authority to impose the fee at issue in this case, but declined to reach an additional question whether the amount of the fee was reasonable, because that issue was not presented by the pleadings. The Court of Appeals affirmed, concluding that the city had authority to enact the ordinance providing for the fee and that the sanitary authority's argument about reasonableness was unpreserved. *Rogue Valley Sewer Services v. City of Phoenix*, 262 Or App 183, 202, 329 P3d 1 (2014). On review, we conclude that the home-rule doctrine is the proper framework for analyzing the fee at issue in this case and that, under that framework, the imposition of the fee was within the authority granted to the city by its charter and was not preempted by state law. We also conclude that the sanitary authority failed to raise the issue of the reasonableness. We therefore affirm.

## I.   BACKGROUND

Rogue Valley Sewer Services (RVS) owns, operates, and manages equipment for the transmission of sewage. As a "sanitary authority" organized under ORS chapter 450, RVS is a type of local government entity called a local service district. *See* ORS 174.116(2)(r) ("[A]s used in the statutes of this state[,] 'local service district' [includes a] sanitary authority *** organized under ORS 450.600 to 450.989."). Local service districts are municipal corporations and local governments. *See* ORS 198.605 ("Local service districts, as defined by ORS 174.116, are municipal corporations."); ORS 174.116(1)(a) ("[A]s used in the statutes of this state[,] 'local government' means all cities, counties and local service districts located in this state[.]").

Since 2004, RVS has provided sewer services to residents of the City of Phoenix (city)—also a local government under Oregon law, ORS 174.116(1)(a)—although the relationship between RVS and the city has changed over time. In 2004, the city and RVS entered into an intergovernmental

agreement that established the services that RVS would provide and the rates that RVS would charge. At that time, the city was not within the political boundaries of RVS. RVS notes that, under that 2004 contract, it had the right—but not the obligation—to use the city's facilities to provide sewer services.

In 2006, a ballot measure asked voters of the city whether the city should be annexed into the service area of RVS. The ballot indicated to voters that the City Council and the RVS Board of Directors had already "unanimously adopted resolutions supporting this annexation" and that "service rates *will not* be increased as a result of this annexation." (Emphasis in original, underscoring omitted.) The voters' pamphlet statements with respect to the ballot measure did not mention whether the city would or could impose a franchise fee or tax on RVS. The residents of the city voted to annex the city into the service area of RVS. As a result, RVS became obligated to provide sewer services to the residents of the city because, for the purposes of sewer services, the residents were now within RVS's jurisdiction.

In 2009, the city held a special election, and the voters approved a home-rule city charter. The charter provides that the city "has all powers that the constitutions, statutes, and common law of the United States and of this state now or hereafter expressly or impliedly grant or allow," and that the charter is to "be liberally construed so the city may exercise fully all powers possible under this charter and under United States and Oregon law." City of Phoenix Charter, § 4-5.

In 2010, the city passed Ordinance No. 928 (the ordinance) imposing a "franchise fee in an amount equal to five percent (5%) of the annual Gross Revenue of RVS *** in addition to taxes or fees, if any, owed to the City."[1] The

---

[1] Ordinance No. 928 defines "Gross Revenue" as "any revenue, as determined in accordance with generally accepted accounting principles, received by RVS[] from the operation of its business," with a few items of revenue excluded. Later, in 2010, to "clarify an issue that has been raised in pending litigation between RVS[] and the City," the city modified the ordinance to clarify that the fee is applicable solely to gross revenue "received by RVS[] from the operation of its business within the City limits." Ordinance No. 931, Sept 7, 2010. For clarity, we refer to "the ordinance," although both Ordinance No. 928 and Ordinance No. 931 are at issue in this case.

ordinance directed RVS to pay the fee on a monthly basis starting the first month after adoption of the ordinance.

The ordinance declares that the "primary purpose of the collection of a franchise fee from RVS is to regulate and reimburse the City for its costs associated with RVS, and not to raise revenue." The ordinance elaborates that it was passed for the purposes of "maintenance and operation of the public rights of way" and "recoupment of the full costs and full impacts associated with the use, occupation, and other activities and effects by sanitary authorities and other utilities on the public rights of ways." The ordinance cites costs, including "additional oversight and associated costs incurred from City administration, maintenance and repair of City-owned facilities within City right-of-ways, special services performed by the City, and office and field-related costs." Overall, the ordinance declares that there is a "direct relationship between the fee charged and the burden produced by the fee payer, RVS[]."

RVS projected that the five percent franchise fee, as assessed on the gross revenues that RVS received from residents of the city, would have totaled approximately $30,741 per year. RVS calculated that, "to be fair to all other customers" living outside the city, it would have to raise its rates for single-family residences in the city from $15.90 per month to $16.70 per month.

RVS filed a complaint in circuit court seeking a declaratory judgment and an injunction. Specifically, RVS asked the court to:

"1.    Declar[e] whether the ordinance *** is valid and whether RVS is required to collect and pay over the fee described in said ordinance.

"2.    Grant an injunction prohibiting [the city] from collecting the franchise fee ***.

"3.    For other such relief as the court may deem equitable."

In the trial court, as part of cross-motions for summary judgment discussed further below, the city reaffirmed the

factual assertions set out in the ordinance. The city claimed that it incurs a variety of costs due to the direct impact of RVS's operations in city streets. Although the direct costs of the paving and construction work are borne by RVS, the city argued that there are additional short-term and long-term impacts that the city bears. Short-term impacts are associated primarily with coordination and include review of plans, inspection during construction, locating utilities, processing encroachment permits, providing water from city fire hydrants for flushing sewer lines, and designing other city utility contracts to avoid RVS facilities. Long-term impacts include costs of maintenance and repair of the streets. Whenever a street surface is cut, a slight differential settlement of the repaired surface is expected, and the joint between the surfaces is more likely to be an entry point for water. Over time, the city Public Works Department expects to fill cracks and make minor repairs on cut streets, until it becomes necessary to conduct a complete asphalt overlay of the street. The city also asserted that, as a direct impact of its relationship with RVS, it incurs general administrative expenses, such as the costs of general administration and oversight, budgeting, coordination of services, interactions with the public, and other expenses. Together, the city estimated that the cost of those impacts for 2009 was $29,425. As such, the city asserted that the five percent franchise fee—at around $30,000 per year—was a reasonable estimate of the annual cost to the city. Additionally, the city pointed out that the five percent fee was consistent with franchise fees that it imposes on other utilities operating in city streets, including the local gas, telephone, power, and cable television companies.

For its part, RVS disputed the existence of any direct relationship between the franchise fee and the costs that RVS's operations impose on the city. RVS argued that the costs that the city identified are part of the normal operations of a city public works department—such as receiving phone calls from citizens—and therefore are not caused by RVS's operations, while other alleged costs are negligible or nonexistent. RVS asserted that, when it proposes a project within the city, it first submits a plan to the city's Public

Works Department for review and comment, and generally receives a phone call or brief letter in response. The city typically observes any paving work to ensure that it meets the city's standards, but, as noted, RVS bears the cost of the paving and construction work associated with its projects. At the time of summary judgment, only one project in the city had required any street cutting or repaving, and only one was planned for the upcoming year. RVS also argued that the costs of its operations in the city are covered by various fees that the city charges—for example, a right-of-way encroachment fee charged to cover the cost of plan review for projects that impact the right-of-way.

Further, in its motion for summary judgment, RVS argued that the city's home-rule authority to impose a franchise fee was preempted by state law because franchise fees are controlled by state statute. RVS also stated in its brief—although in the "Background Facts" section rather than as a legal argument—that, "even assuming that [the city] has authority to impose a franchise fee on RVS, the Ordinance as worded relies upon an improper interpretation of Oregon statutes, is too broadly written and has no rational basis to support the rate." The city filed a cross-motion for summary judgment, arguing that it had authority to enact the ordinance and that the fee "represents a reasonable estimate of the annual cost to the City of the many impacts of RVS identified in the Ordinance," and concluding that "[t]he 5% fee is reasonable by all standards."

The trial court articulated the issue presented as "whether or not the City *** under its home rule charter can charge a franchise fee on sewer operations provided by [RVS]." The court found that "the analysis of the [city] in its motion and in its response to [RVS's] motion is correct in that it has the authority to impose the fee." Therefore, the court granted the city's motion for summary judgment and denied RVS's motion for summary judgment.

The city then submitted a proposed general judgment. RVS objected to the proposed judgment on the ground that the trial court's order resolved only the issue whether the city had authority to charge the fee, but did not resolve

the issue of the reasonableness of the fee. RVS argued that a question of fact existed as to the reasonableness of the fee that precluded summary judgment and pointed to "competing affidavits" on the issue. RVS suggested that a limited judgment—addressing only the issue of the city's authority to impose the assessment—would be more appropriate. In response, the city argued that the amount of the fee should be left to the discretion of the city and was not at issue in the case.

The trial court overruled RVS's objection to the proposed general judgment, concluding that "there [was] nothing left for the Court to adjudicate" because "nothing in the complaint [or in RVS's motion for summary judgment suggested that] RVS[] also challenged the reasonableness of the fee in the event [the city's] authority was upheld." In so holding, the court concluded:

> "To be sure, in arguing the ordinance is too broad, RVS cited the amount of the fee, but any such argument is subsumed within the argument about the propriety of the ordinance (assuming [the city] had the authority to enact it), and the Court's decision upholding [the city]'s authority to impose the fee, the content of the ordinance, and the imposition of the fee, disposed of RVS'[s] argument about the amount of the fee."

The court entered a general judgment in the city's favor.

RVS appealed, arguing that "the trial court erred in concluding that the city was authorized to impose the five percent franchise fee, and, alternatively, that the court erred in granting summary judgment because genuine issues of material fact exist regarding calculation of the fee." *Rogue Valley*, 262 Or App at 187. As to the first argument, the Court of Appeals concluded that RVS's status as a local government did not circumscribe the city's authority as a home-rule municipality and that the city's home-rule authority to enact the fee was not preempted by state law. *Id.* at 188, 199. As to the second argument, the Court of Appeals concluded that RVS had not preserved its argument regarding the reasonableness of the amount of the fee and rejected RVS's argument that the parties had tried the issue by consent. *Id.* at 201-02. RVS petitioned for review in this court, and we allowed the petition.

## II.　ANALYSIS

Ordinarily, when a "petitioner['s] arguments implicate the authority of [a] city, we begin with \*\*\* the authority of such local governments" under the "home-rule" provisions of the Oregon constitution. *Gunderson, LLC v. City of Portland*, 352 Or 648, 658-59, 290 P3d 803 (2012). "'Home rule' itself is not a constitutional term, and the actual constitutional terms differ from state to state. But 'home rule' has been described as the 'political symbol' for the objectives of local authority." *LaGrande/Astoria v. PERB*, 281 Or 137, 140 n 2, 576 P2d 1204, *adh'd to on recons*, 284 Or 173, 586 P2d 765 (1978). Home rule is the authority granted to Oregon's cities by Article XI, section 2, and Article IV, section 1(5), of the Oregon Constitution—adopted by initiative petition in 1906—to regulate to the extent provided in their charters. Article XI, section 2, provides, in part, "The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon[.]" In the same 1906 election, voters "reserved" initiative and referendum powers "to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district." Or Const, Art IV, § 1(5).

RVS argues, however, that the home-rule analysis does not apply—or does not apply in the same way—in the context of a fee or tax that one governmental entity imposes on another and that the Court of Appeals erred in concluding that RVS's status as a local government has no impact on the city's home-rule authority. As noted above, RVS is a sanitary authority, and the legislature has expressed its intention that sanitary authorities be considered municipal corporations and a type of local government under Oregon law. For those reasons, RVS claims, the trial court erred in granting the city's motion for summary judgment based on its home-rule authority. We review the trial court's rulings on summary judgment "to determine whether 'there is no genuine issue as to any material fact' and whether 'the moving party is entitled to prevail as a matter of law.'" *Bagley v. Mt. Bachelor, Inc.*, 356 Or 543, 545, 340 P3d 27 (2014) (citing ORCP 47 C).

A.   *Intergovernmental Taxation*

RVS first argues that this is not a "home rule" case because it involves "intergovernmental taxation." RVS argues that the city must first have unmistakable, express statutory authority before it can impose taxes or fees on another local government. RVS draws that rule from three of this court's cases: *Portland v. Multnomah County*, 135 Or 469, 296 P 48 (1931); *Portland v. Welch et al.*, 126 Or 293, 269 P 868 (1928); and *Cent. Lincoln PUD v. State Tax Com.*, 221 Or 398, 351 P2d 694 (1960). The city responds that this case concerns a fee, rather than a tax, and therefore that that case law is inapplicable.

All three of the cases upon which RVS relies concern the imposition of a tax. In *Welch*, a city had offered land for sale, but had not yet sold that land, and this court held that the county in which the land was located could not impose otherwise applicable property taxes on that land. 126 Or at 294-97. In *Multnomah County*, the opposite occurred: the property was in private ownership on "tax day" when taxes were assessed, but a city bought the property before any tax had been levied. 135 Or at 470. This court held the property was nonetheless "clearly exempt from taxation." *Id.* at 473. In *Central Lincoln*, this court held that plaintiff, a people's utility district (PUD), was subject to a utility corporation excise tax. 221 Or at 401, 407. However, the court concluded that its interpretation of the statute at issue did not necessarily extend the tax to municipal corporations because "[t]he intention to tax a municipality is not to be inferred, but must be clearly manifested by an affirmative legislative declaration." *Id.* at 406. In that case, a clear legislative declaration of the intention to tax PUDs existed, because PUDs were specifically included in the statute. *Id.*

"A tax is any contribution imposed by government upon individuals, for the use and service of the state. A fee, by contrast, is imposed on persons who apply for or receive a government service that directly benefits them." *[McCann v. Rosenblum](#)*, 355 Or 256, 261, 323 P3d 955 (2014) (internal quotation and citation omitted). In *McCann*, this court quoted *Qwest Corp. v. City of Surprise*, 434 F3d 1176, 1183 (9th Cir 2006), in support of the rule that the distinction

between a tax and a fee is whether the "charge is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed." *McCann*, 355 Or at 261-62. Thus, the ballot measure at issue in that case, which would have imposed a markup on wholesale alcohol sales, was properly labeled a "tax," because the revenues generated by the markup would be distributed to the state's general fund, as well as to the general funds of cities and counties, and would be available for general government use. *Id.* at 261-62; *see also Dennehy v. Dept. of Rev.*, 305 Or 595, 605-06, 756 P2d 13 (1988) (state statute did not contravene constitutional limits on property taxation, because "[u]rban renewal financing is not a single, statewide tax to fund public structures or services unrelated to the source of funding"; rather, it "places the cost of urban renewal on the property that benefits from the expenditure of the funds so raised").

A fee, then, is imposed on particular parties and is used to regulate or benefit those parties rather than being used for general public purposes or to raise revenue for such purposes. In this case, the ordinance applies to one particular party only, RVS, and the ordinance directs that the city will "allocate money collected from RVS only for costs and reimbursement connected with proper regulatory purposes." The money collected from the franchise fee is to be used to cover "the full costs and full impacts associated with [RVS's] use, occupation, and other activities" in the city's rights-of-way, including "the additional oversight and associated costs incurred from City administration, maintenance and repair of City-owned facilities within City right-of-ways, special services performed by the City, and office and field-related costs." Although RVS expresses skepticism as to whether the fee actually will be directed towards regulatory purposes related to sanitary services, as the city claims, nothing in the record indicates that the fee will be used for general government purposes, rather than for appropriate regulatory purposes.

In sum, the record establishes that the city will use the money collected from the franchise fee to regulate and benefit the party from whom the fee is collected and to cover

costs directly imposed on the city by that party. That "distribution scheme" and the "uses to which that money [can] be put" demonstrate that the ordinance provides for the collection of a fee, rather than a tax. *McCann*, 355 Or at 262 (wholesale alcohol markup properly labeled a "tax," because not "used to provide services that directly benefit wholesalers" but, rather, distributed to state, cities, and counties for general government use). Because we conclude that the ordinance provides for the collection of a fee, and not a tax, RVS's arguments based on the prohibition of intergovernmental taxation discussed in some of our cases are inapposite here.[2]

## B.    *Regulation of Other Public Entities*

RVS next argues that the city cannot justify the franchise fee based on its home-rule authority because regulation of another governmental entity is different from regulation of private entities under the city's home-rule powers. To allow regulation of other government entities, RVS argues, would create a hierarchy among local governments that has no support in the law and would allow a city to exercise authority beyond its boundaries. It contends that such "extramural" or "extramunicipal" activity is not within the scope of a city's home-rule powers and is impermissible unless authorized expressly by statute.

RVS is correct that this court has recognized some limits on a local government's authority to compel or coerce another government to take some affirmative action. *See*

---

[2] At oral argument, RVS also argued that the ordinance cannot be said to provide for a "use fee" because such fees are charged in *exchange* for some service, right, or privilege. RVS claims that the city had already transferred the right to use the right-of-way to RVS by consenting to the annexation. *See* ORS 450.815(7) (a sanitary authority has the power to "[l]ay its sewers and drains in any public street, highway or road in the county, and for this purpose enter upon it and make all necessary and proper excavations, restoring it to its proper condition"). That is, RVS argues, no benefit is conferred on RVS in exchange for the franchise fee, and therefore the ordinance cannot be characterized as a fee. We disagree. As noted, a fee is "'used for the *regulation or benefit* of the [assessed] parties.'" *McCann*, 355 Or at 262 (quoting *Qwest Corp.*, 434 F3d at 1182 (emphasis added)). Although there may be circumstances where the terms of conferring the benefit on an assessed party precludes the later imposition of a fee in the name of regulation, that is not the situation in this case. Even if we were to accept RVS's argument that authority to use the right-of-way was transferred with the annexation, the ordinance provides for a fee for "regulation" of RVS; there is no requirement that the ordinance also confer some additional benefit.

*City of Eugene v. Roberts*, 305 Or 641, 649-650, 756 P2d 630 (1988) (home rule did not provide city with authority "to compel action by state and county officials" to put an advisory question on the state primary election ballot); *DeFazio v. WPPSS*, 296 Or 550, 582, 679 P2d 1316 (1984) (cities lack authority to "assert coercive authority over persons or property outside [their] boundaries"). For example, in *Kiernan v. Portland*, 57 Or 454, 111 P 379, *recons den*, 57 Or 454, 112 P 402 (1910), *dismissed for lack of jurisdiction*, 223 US 151, 32 S Ct 231, 56 L Ed 386 (1912), the City of Portland amended its charter to provide for construction of the Broadway Bridge and that, "upon completion of the bridge[,] the executive board shall surrender and deliver the possession thereof to the county court of Multnomah County." *Id.* at 462. This court held that it was "beyond the power of the [C]ity [of Portland] to impose the care and maintenance of a public bridge upon Multnomah County without the county authorities['] consent thereto." *Id.* at 463. That was so because Portland was attempting to compel Multnomah County to assume a new governmental function—bridge maintenance—and local governments cannot interfere with another government's exercise of its own governmental power and functions. *See also* Orval Etter, *Municipal Home Rule On and Off: "Unconstitutional Law in Oregon" Now and Then* 103 (Sourcebook ed 1991) (describing *Kiernan* as "the first ruling that home rule does not enable a city to change a power or duty of a governmental entity other than the city"); Letter of Advice dated Dec 24, 1985, to Senator Ken Jernstedt (OP-5863) (concluding that city could impose an excise tax or municipal surcharge on bridge tolls, but could not compel the port to collect a tax on tolls because "a municipality, absent statutory authority, may not impose a duty upon any other political subdivision or agency of the state to collect municipal taxes").

Those principles, however, do not go so far as to prohibit the city's fee in this case. While *City of Eugene* and *Kiernan* demonstrate that a city cannot, on the basis of its home-rule authority, impose a duty on or impair a power of another governmental entity, nothing in those cases would prevent a city from exercising the same kind of regulatory authority over specific services provided by another local

government entity on the same basis as services provided within the city by a private business. In this case, the franchise fee of five percent of RVS's revenue places RVS on an equal footing with other utilities operating within the city. As discussed further below, the legislature has provided a framework for cities to collect a franchise fee from utilities, both public and private, operating within their rights-of-way. *See* ORS 221.420; ORS 221.450. Where cities and utilities have not entered into an agreement for a different fee arrangement, the legislature provides for a five percent fee. ORS 221.450. Although RVS correctly points to limits on the home-rule doctrine that prohibit local governments from compelling affirmative conduct by other government entities, the limitations that it has identified do not restrict the city's authority to pass the ordinance at issue in this case.

## C.  *Home Rule*

Under a city's home-rule authority, "the validity of local action depends, first, on whether it is authorized by the local charter or by a statute[, and] second, on whether it contravenes state or federal law." *LaGrande/Astoria*, 281 Or at 142. The parties do not contend that the ordinance was not authorized by the city's charter, which provides that the "city has all powers that the constitutions, statutes, and common law of the United States and of this state now or hereafter expressly or impliedly grant or allow" and that the charter is to "be liberally construed so the city may exercise fully all powers possible under this charter and under United States and Oregon law." City of Phoenix Charter, § 4-5. Therefore, we must determine "whether the local rule in truth is incompatible with the legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive." *LaGrande/Astoria*, 281 Or at 148.

In making that determination, we assume that "the legislature does not mean to displace local civil or administrative regulation of local conditions by a statewide law unless that intention is apparent." *LaGrande/Astoria*, 281 Or at 148-49 (footnote omitted). A state statute will displace the local rule where the text, context, and legislative history of the statute "*unambiguously* expresses an intention to preclude local governments from regulating" in the same

area as that governed by the statute. *Gunderson*, 352 Or at 663 (emphasis added); *see also US West Communications v. City of Eugene*, 336 Or 181, 186, 81 P3d 702 (2003) (applying standard statutory interpretation methodology to a question of home-rule city's authority to impose fee on telecommunications company).

RVS argues that ORS 221.420 and ORS 221.450 establish a comprehensive, statewide scheme that the legislature intended to be the exclusive basis for city imposition of fees upon utilities for using public rights-of-way. The city responds that those statutes do not address sanitary authorities and, therefore, the legislature has not unambiguously expressed any intention to preempt the ordinance at issue here.

ORS 221.420(2)(a) provides that a city may:

"Determine by contract or prescribe by ordinance or otherwise, the terms and conditions, including payment of charges and fees, upon which any public utility, electric cooperative, people's utility district or heating company, or Oregon Community Power, may be permitted to occupy the streets, highways or other public property within such city and exclude or eject any public utility or heating company therefrom."

RVS, as a sanitary authority organized under ORS chapter 450, is not a "public utility" under ORS 221.420. ORS 221.420(1)(a) provides that "public utility" is to be given the meaning provided in ORS 757.005, which defines "public utility" to include only those entities furnishing "heat, light, water or power." ORS 757.005(1)(a)(A). RVS does not provide heat, light, water or power; it provides sanitation services. Therefore, ORS 221.420(2)(a) does not affirmatively provide authority for the city to impose the fee at issue in this case, but neither does it, standing alone, unambiguously preclude the city from imposing the fee.

RVS also points to ORS 221.450, which provides:

"[E]very incorporated city may levy and collect a privilege tax from Oregon Community Power and from every electric cooperative, people's utility district, privately owned public utility, telecommunications carrier as defined in ORS 133.721 or heating company. The privilege tax may

be collected only if the entity is operating for a period of 30 days within the city without a franchise from the city and actually using the streets, alleys or highways, or all of them, in such city for other than travel on such streets or highways. The privilege tax shall be for the use of those public streets, alleys or highways, or all of them, in such city in an amount not exceeding five percent of the gross revenues of the cooperative, utility, district or company currently earned within the boundary of the city. However, the gross revenues earned in interstate commerce or on the business of the United States Government shall be exempt from the provisions of this section. The privilege tax authorized in this section shall be for each year, or part of each year, such utility, cooperative, district or company, or Oregon Community Power, operates without a franchise."

Like ORS 221.420, ORS 221.450 does not explicitly apply to sanitary authorities like RVS.

Read together, RVS argues, ORS 221.420 and ORS 221.450 provide statutory authority that, for the enumerated entities to which they apply, permits a city to either enter into a franchise agreement with a utility or impose a privilege tax in lieu of negotiating a franchise agreement. The legislative history of House Bill (HB) 3021—the 1987 revision to ORS 221.420 and ORS 221.450—suggests that the legislature was told that the statutes would operate so that ORS 221.450 functioned as a "penalty clause," such that,

"if *** [y]ou, as a private utility *** don't sit down and negotiate a franchise regulation ordinance or agreement so that we're working together, then you're going to pay more. You're going to pay five percent. If you come in and get a franchise, and you sit down at the table *** and we mutually regulate it together, basically, then [you pay less]."

Tape Recording, House Committee on Environment and Energy, HB 3021, Apr 22, 1987, Tape 122, Side B (statement of Larry Shaw).

RVS argues, therefore, that the legislature intended to occupy the field and preempt cities from imposing fees on public utilities other than through the comprehensive scheme established by ORS 221.420 and ORS 221.450. In

particular, RVS argues that the legislature intended the list of utility service providers in ORS 221.420(2)(a) to be construed as an exclusive list of utility service providers that a city may target for such charges and fees—and that all other nonenumerated entities cannot be charged similar charges or fees. Put differently, from those affirmative statutory authorizations of privilege taxes that a city may charge for certain utilities operating within the city, RVS draws the negative implication that a city may not impose such taxes or fees on other utilities.

Even if ORS 221.420 and ORS 221.450 establish a comprehensive scheme as to municipal regulation of some entities—an issue that we do not decide—that conclusion would not preclude the city's fee in this case. RVS essentially argues that, because sanitary authorities are not specifically enumerated in ORS 221.420, the legislature intended to exempt sanitary authorities from franchise fees. Although RVS does not explicitly use the Latin term, that argument invokes the logic of *expressio unius est exclusio alterius*, literally "the expression of one is the exclusion of others." *See Black's Law Dictionary* 701 (10th ed 2014) ("A canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative. For example, the rule that 'each citizen is entitled to vote' implies that noncitizens are not entitled to vote."). *Expessio unius* arguments are most powerful when there is reason to conclude that a list of enumerated terms was intended to be exhaustive. *See Colby v. Gunson*, 224 Or App 666, 671, 199 P3d 350 (2008) ("the *expressio unius* guide to legislative intent corroborates, rather than supplies, meaning to a statute").

To show that the legislature intended the list to be exhaustive, RVS points to legislative history from HB 3021 relating to a proposal to add certain publically owned utilities to the lists of already-enumerated privately owned entities in ORS 221.420 and ORS 221.450. In the hearings on HB 3021, a representative wondered whether the bill would apply to telephone cooperatives and was told it would not "affect" entities that fell outside the definition of "public utility." Tape Recording, House Committee on Environment and Energy, HB 3021, Apr 22, 1987, Tape 122, Side B (statement

of Larry Shaw). From that slim legislative history, RVS concludes that the franchise fee at issue here is invalid because, if the statutes were not intended to apply to telephone cooperatives, they also were not intended to be applied to other nonenumerated public entities.

A party that challenges a home-rule city's authority as preempted by state law is required to show that the legislature "unambiguously" expressed its intent—a high bar to overcome. *Gunderson*, 352 Or at 663. As noted above, in the context of the home-rule doctrine, we begin with the assumption "that the legislature does not mean to displace local civil or administrative regulation of local conditions by a statewide law unless that intention is apparent." *LaGrande/Astoria*, 281 Or at 148-49. Only where the legislature "*unambiguously* expresses an intention to preclude local governments from regulating" in the same area governed by an applicable statute can that presumption against preemption be overcome. *Gunderson*, 352 Or at 663 (emphasis added); *cf. State ex rel Haley v. City of Troutdale*, 281 Or 203, 211, 576 P2d 1238 (1978) (because any legislative intent to preempt local action exceeding state "minimum" construction standards was "not unambiguously expressed[,] local requirements compatible with compliance with the state's standards are not preempted").

The legislative history of HB 3021 does not rise to the level of "unambiguously" expressing legislative intent to occupy the field. *See State v. Gaines*, 346 Or 160, 172-73 n 9, 206 P3d 1042 (2009) (reliance on "the beliefs of a single legislator or witness" is "fraught with the potential for misconstruction"). Notably, the legislature has expressly preempted local regulation of certain areas of law by using the word "preempt" itself. *See* ORS 731.840(4) ("[t]he State of Oregon hereby preempts the field," and "[n]o county, city, district, or other political subdivision or agency in this state shall so regulate"); ORS 203.090 ("The[se] provisions *** preempt any laws of the political subdivisions of this state relating to the regulation of private security providers."). In other statutes, it has expressed its disapproval of conflicting local laws in equally clear terms. *See* ORS 461.030(1) ("no local authority shall enact any ordinances, rules or regulations

in conflict with the provisions hereof"). However, we see no reason to *imply* such broad preemption of the entire field of utility regulation from the explicit authorization of regulation of certain other utilities.

Further, ORS 221.420 and ORS 221.450 do not create a statutory scheme that prevents the state law and local ordinance from operating concurrently. *LaGrande/Astoria*, 281 Or at 148. Rather, the state regulates less extensively than the local ordinance, and leaves it to cities to enact reasonable conditions of consent for sanitary authorities. *See* ORS 450.815(7); *cf. State ex rel Haley*, 281 Or at 205, 211 (state building code providing for single wall construction did not indicate that legislature intended to prevent cities from enacting additional safeguards—such as requiring double wall construction—and at minimum such an intention was not "unambiguously expressed"); *Thunderbird Mobile Club v. City of Wilsonville*, 234 Or App 457, 474, 228 P3d 650 (2010), *rev den*, 348 Or 524, 236 P3d 152 (2010) ("Under *LaGrande/Astoria*, * * * the occupation of a field of regulation by the state has no necessary preemptive effect * * *. Instead, a local law is preempted only to the extent that it 'cannot operate concurrently' with state law, *i.e.*, the operation of local law makes it impossible to comply with a state statute.").

That conclusion is strengthened by two other expressions of the legislature's intent. First, in HB 3021 the legislature provided that, by enacting ORS 221.420 and ORS 221.450, it was simply "*reaffirm[ing]* the authority of cities to regulate use of municipally owned rights of way" and that it "recognize[d] the independent basis of legislative authority granted to cities in this state by municipal charters." ORS 221.415 (emphasis added).[3] That is, the legislature apparently thought that HB 3021 was not necessary to provide cities with authority to impose taxes and fees because they already possessed that authority. Rather, the legislature passed that bill in response to a then-recent

---

[3] Although ORS 221.415 goes on to also affirm the authority of cities to "impose charges upon publicly owned suppliers of electrical energy, as well as privately owned suppliers," we do not read that subordinate clause as negating the broader affirmation of the authority of cities to regulate their rights-of-way.

circuit court decision that had held to the contrary with respect to a people's utility district.[4]

Second, in a different statute, the legislature appears to have anticipated the kind of fee at issue in this case and provided that such conditions on the use of the public rights-of-way by a sanitary authority are appropriate. ORS 450.815(7), in defining the powers of a sanitary authority, provides that a sanitary authority may:

> "Lay its sewers and drains in any public street, highway or road in the county, and for this purpose enter upon it and make all necessary and proper excavations, restoring it to its proper condition. *However, the consent of the proper city,* county or state authorities, as the case may be, *shall first be obtained and the conditions of such consent complied with.*"

(Emphasis added.) The legislature apparently intended that use of public rights-of-way by a sanitary authority be contingent upon its compliance with reasonable conditions imposed by a city.

Because neither ORS 221.420 nor ORS 221.450 unambiguously express a legislative intent to preempt local

---

[4] Specifically, the legislature was reacting to the then-recent circuit court decision in *Columbia River People's Utility District v. City of St. Helens et al*, No. 85-2236 (Columbia County Circuit Court, July 15, 1986). In that case, the circuit court held that "the legislature has declared by inference that People's Utility Districts are not subject to franchise fees (excise taxes) such as defendant cities desire to impose." *Id.* at 3. The legislature passed HB 3021 "just [as] a legislative emergency fix for the problem [presented by the circuit court case] and [did not go] beyond that." Tape Recording, House Committee on Environment and Energy, HB 3021, Apr 22, 1987, Tape 122, Side B (statement of Larry Shaw). Specifically, the legislature was told that the "bill only affects electrical utilities" and that other entities, such as telephone cooperatives, were "not affected by this bill at all." *Id.* Because *Columbia River* was pending before the Court of Appeals at the time, a representative noted that, if the cities wanted to continue their appeal "on a home rule issue that says that the city has the right to [impose a fee]—that's up to them—but that issue stands aside from this bill. The home rule issue is a little broader, I think, than what we are dealing with here." Tape Recording, Senate Agriculture and Natural Resources Committee, HB 3021, Apr 29, 1987, Tape 138, Side A (statement of Rep Bruce Hugo). Therefore, it appears that the legislature did not intend HB 3021 to impact the home-rule authority of cities, but, instead, merely to clarify that such a fee could be imposed on People's Utility Districts. *See also* ORS 221.415 ("Recognizing the independent basis of legislative authority granted to cities in this state by municipal charters, the Legislative Assembly intends *** to reaffirm the authority of cities to regulate use of municipally owned rights of way and to impose charges upon publicly owned suppliers of electrical energy, as well as privately owned suppliers for the use of such rights of way.").

action, and also because the statutes and legislative history suggest that the legislature in fact did not intend to preempt local governments from imposing such conditions on the use of their rights-of-way by sanitary authorities, we conclude that the franchise fee at issue in this case is not preempted by state law.

D. *Reasonableness of the Fee*

Finally, RVS argues that the Court of Appeals erred in ruling that its argument challenging the reasonableness of the franchise fee was not preserved. RVS asks that we remand the case to the trial court to resolve material questions of fact relating to the amount of the fee that may be imposed. *See Eugene Theatre et al. v. Eugene et al.*, 194 Or 603, 613, 243 P2d 1060 (1952) (fee "far in excess of what might be deemed reasonably necessary for purposes of regulation" is invalid). The city responds that the issue is unpreserved because RVS's complaint did not state a separate claim for relief regarding the amount of the fee and RVS's motion for summary judgment focused on whether the city had authority to impose the fee, not whether the fee was reasonable. On that basis, the city argues that the trial court and the Court of Appeals properly declined to reach the issue whether the amount of the fee was reasonable.

Even if the affidavits and cross-motions for summary judgment in this case "might provide a basis for an amendment to the pleadings to make it an issue," a court may not "award relief outside the issues of the case." *Heintz v. Sinner et ux*, 232 Or 529, 533, 376 P2d 478 (1962). As noted, RVS did not seek a declaration that the fee was unreasonable in amount. Rather, RVS's complaint asked the court to:

"1.   Declar[e] whether the ordinance *** is valid and whether RVS is required to collect and pay over the fee described in said ordinance.

"2.   Grant an injunction prohibiting [the city] from collecting the franchise fee ***.

"3.   For other such relief as the court may deem equitable."

Moreover, RVS did not seek to amend its complaint during or after the summary judgment proceedings.

Here, as the trial court stated, "nothing in the complaint \*\*\* challenged the reasonableness of the fee, in the event [the city's] authority was upheld." This court has explained that

> "a decree or judgment must be responsive to the issues framed by the pleadings and a trial court has no authority to render a decision on issues not presented for determination. In absence of amendment of the pleadings, evidence received without objection will not provide a basis for such a decree."

*Brown v. Brown*, 206 Or App 239, 248, 136 P3d 745 (2006), *rev den,* 341 Or 449 (2006) (internal quotation and citation omitted); *see also Central Oregon Fabricators, Inc. v. Hudspeth,* 159 Or App 391, 403, 977 P2d 416, *rev den*, 329 Or 10 (1999) (trial court erred in granting relief on unpleaded theory, where plaintiffs never sought leave to amend pleadings). Because RVS did not move to amend the pleadings, it was not error for the trial court to overrule RVS's objection to the proposed judgment.[5] We conclude that the trial court correctly declined to rule on an issue not properly before it.

## III.   CONCLUSION

We hold that the city was authorized, under its home-rule authority, to adopt the ordinance at issue in this case. The franchise fee that the ordinance prescribes is not preempted by state law. RVS did not present the issue of the

---

[5] Although RVS acknowledges that its complaint did not state a separate claim for relief regarding the amount of the fee, and that it did not otherwise amend its pleading, it nevertheless argues that that issue was tried by consent during the summary judgment proceedings. Under ORCP 23 B, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." ORCP 23 B; *Navas v. City of Springfield*, 122 Or App 196, 201, 857 P2d 867 (1993) ("Generally, a trial court has no authority to render a decision on an issue not framed by the pleadings. \*\*\* ORCP 23 B states a limited exception to this rule: if the parties expressly or impliedly consent, they may try issues not raised in the pleadings."). Here, the amount of the fee was discussed in the summary judgment proceedings in connection with characterizing the ordinance as a tax or fee, but not in seeking a declaration as to whether the amount of a fee was reasonable. We therefore agree with the Court of Appeals that the issue of the reasonableness of the fee was not tried by express or implied consent of the parties. *Rogue Valley*, 262 Or App at 201.

reasonableness of the amount of the fee to the trial court in its pleadings.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.