Argued and submitted September 19, 2014, affirmed December 30, 2015

QWEST CORPORATION,
a Colorado corporation,
dba Centurylink,
*Plaintiff-Appellant,*

*v.*

CITY OF PORTLAND,
a municipal corporation,
*Defendant-Respondent.*

Multnomah County Circuit Court
121216632; A154769

365 P3d 1157

Henry C. Breithaupt, Judge pro tempore.

Per A. Ramfjord argued the cause for appellant. With him on the opening brief were Theodore B. Blank and Stoel Rives LLP. With them on the reply brief was Reilley D. Keating.

Denis M. Vannier, Deputy City Attorney, argued the cause and filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Plaintiff Qwest Corporation[1] appeals from the trial court's judgment granting defendant City of Portland declaratory relief. Qwest assigns error to the trial court's declaratory ruling that the "utility license fee" (ULF), a tax imposed by the city, does not violate a state law capping the amount municipalities may charge telecommunications carriers for the use of municipal rights-of-way. Qwest argues that the ULF is preempted in that it is actually a privilege tax governed by ORS 221.515(1) and the ULF exceeds the cap on such taxes set out in that statute. The city acknowledges that the statute caps the rate at which it can collect privilege taxes from telecommunications carriers for the use of its rights-of-way, but it argues that the statute does not preclude it from imposing other taxes and fees, such as a tax on utilities for the privilege of doing business within the city, and it claims that that is what the ULF is. We agree with the city and therefore affirm.

## I. BACKGROUND

For context, we begin with an overview of ORS 221.515, the statute on which Qwest relies, and provisions of the city code that permit the city to obtain revenues from Qwest's operations within the city. The statute,[2]

---

[1] Qwest's full party name in the case is "Qwest Corporation, a Colorado corporation, dba Centurylink." For brevity and consistency with the trial court, we refer to it as "Qwest."

[2] ORS 221.515 provides, in its entirety:

"(1) The council of every municipality in this state may levy and collect from every telecommunications carrier operating within the municipality and actually using the streets, alleys or highways, or all of them, in such municipality for other than travel, a privilege tax for the use of those streets, alleys or highways, or all of them, in such municipality in an amount which may not exceed seven percent of the gross revenues of the telecommunications carrier currently earned within the boundaries of the municipality. The privilege tax authorized in this section shall be for each year, or part of each year, that such telecommunications carrier operates within the municipality.

"(2) As used in this section, 'gross revenues' means those revenues derived from exchange access services, as defined in ORS 403.105, less net uncollectibles from such revenues.

"(3) A telecommunications carrier paying the privilege tax authorized by this section shall not be required to pay any additional fee, compensation or consideration, including the free use or construction of telecommunications facilities and equipment, to the municipality for its use of public

which became effective in 1990, Or Laws 1989, ch 484, § 9, pertains only to "telecommunications carriers" as defined in ORS 133.721. ORS 221.515(4). Under ORS 221.515(1), Oregon municipalities "may levy and collect from every tele-communications carrier operating within the municipality and actually using the streets, alleys or highways," except for travel, "a privilege tax for the use of those streets, alleys or highways * * * in an amount which may not exceed seven percent of the gross revenues of the telecommunications car-rier currently earned within the boundaries of the munici-pality." The privilege tax is calculated on a portion of the tele-communications carrier's revenue "derived from exchange access service[.]" ORS 221.515(2). Exchange access service, defined by ORS 403.105(10), is local telephone service, and does not include other services such as long-distance ser-vice. Under ORS 221.515(3), a telecommunications carrier that pays the privilege tax authorized under the statute is not required to pay other taxes or fees to the municipality "for its use of public streets, alleys, or highways, or all of them, and shall not be required to pay any additional tax or fee on the gross revenues that are the measure of the privi-lege tax."

As relevant to this case, the city imposes both a utility "privilege tax" and the ULF on various utilities that operate within its borders. The city imposes a privilege tax on certain utilities that use or occupy the city's rights-of-way, "for the use and occupancy of" those rights-of-way. Portland City Code (PCC) 7.12.060. In accordance with ORS

---

streets, alleys, or highways, or all of them, and shall not be required to pay any additional tax or fee on the gross revenues that are the measure of the privilege tax. As used in this subsection, 'use' includes, but is not limited to, street openings, construction and maintenance of fixtures or facilities by telecommunications carriers. As used in this subsection, 'additional fee, compensation or consideration' does not include commissions paid for siting public telephones on municipal property. To the extent that separate fees are imposed by the municipality on telecommunications carriers for street openings, construction, inspection or maintenance of fixtures or facilities, such fees may be deducted from the privilege tax authorized by this section. However, telecommunications carriers shall not deduct charges and penal-ties imposed by the municipality for noncompliance with charter provisions, ordinances, resolutions or permit conditions from the privilege tax autho-rized by this section.

"(4) For purposes of this section, 'telecommunications carrier' has the meaning given that term in ORS 133.721."

221.515, that tax is seven percent for a "telecommunications utility," calculated on its exchange access service revenue earned within the city. PCC 7.12.060(C). A crediting provision allows a utility operating under a revocable permit "for using the streets" to deduct from its privilege tax obligation any amount paid under the permit.[3] PCC 7.12.110.

At the same time, the city requires anyone operating a "utility" within the city to obtain a license from the city, for which it charges a tax—the ULF. PCC 7.14.020, PCC 7.14.060. For such license purposes, a "utility" is defined, in part, as "the business of supplying * * * telecommunications." PCC 7.14.040(I). In turn, "telecommunications" is defined, in part and with some exceptions, as "the providing or offering * * * of the transmittal of voice, data, image * * * or any other information between or among points by wire, cable, fiber optics, laser, microwave, radio, or similar facilities[.]" PCC 7.14.040(H). The ULF requires designated utilities, including telecommunications utilities, to pay a five percent tax calculated on their gross revenues earned within the city.[4] PCC 7.14.060(A).

However, a crediting provision in the city's code allows utilities subject to the ULF to deduct from their ULF obligations payments they make under the terms of permits and franchises. PCC 7.14.070. In addition, if all of a utility's revenues "earned from operations as a utility otherwise meet the criteria for deduction under" that crediting provision, it

---

[3] The city requires compensation for the use of its rights-of-way in two ways. The first is the city's privilege tax. The second is via permits, franchises, and similar agreements. Through permits and franchises, the city grants utilities permission to use and occupy the city's rights-of-way, regulates that use, and in return requires payment. That system is relevant here as it relates to the crediting provisions of the privilege tax and the ULF. As we will discuss, Qwest uses and occupies the city's rights-of-way under a temporary revocable permit that entitles it to a credit for its permit-fee payment that eliminates its privilege tax obligation and reduces its ULF obligation.

[4] Within the ULF law, "gross revenue," as relevant here, is defined as "any revenue earned within the City, * * * from the furnishing or sale of communications or associated services by or from a telecommunications * * * business[,]" subject to certain adjustments and exceptions. PCC 7.14.040(D). Because ORS 221.515 and the city's privilege tax also use the term "gross revenues," but define it to mean a more limited portion of revenue, for clarity we refer to the revenue base used in the statute and the privilege tax as "exchange access service revenue," and the revenue base used in the ULF as "gross revenues."

"is not required to apply for or obtain a utility license * * *."
PCC 7.14.050(B).

It is undisputed that Qwest is a telecommunications carrier for purposes of ORS 221.515 and that it falls within the city's definitions of a utility subject to both the ULF and the city's privilege tax. That is because it is a utility doing business in the city and providing telecommunication services via wires, cables, and other networked equipment in the city's rights-of-way, both above and beneath city roadways.

Qwest has a temporary revocable permit from the city under which Qwest pays the city the equivalent of the privilege tax, consisting of seven percent of its exchange access service revenue, for its use of the city's rights-of-way. *See* PCC 7.12.110 (providing that "[a]ny amount which any utility [pays] * * * under the terms of any revocable permit * * * for using the streets shall be credited against the amount" owed for the privilege tax). As a utility, Qwest is also subject to the ULF, subject to the credit in PCC 7.14.070.

Because the history of the ULF forms the basis for part of Qwest's argument, we briefly review the most relevant changes to that law. In 1946, the city amended its license and business code to create the ULF. Portland Ordinance 82958 (June 27, 1946) (1946 ULF). The city already had a privilege tax, which was enacted in 1932, Portland Ordinance 62282 (Mar 16, 1932), and it already used permits and franchises to regulate and charge utilities for their use of the city's rights-of-way.

To "more equitab[ly] distribut[e] the costs of local government," the city created the ULF as a business license tax that applied to specified utilities operating within the city. 1946 ULF, Section 1. The tax for the required license was a percentage of a covered utility's gross revenues earned within the city, with certain adjustments, and utilities that made payments under licenses and franchises could deduct those payments from the fee. 1946 ULF, Section 1, Article 75, §§ 20-7502, 20-7504, 20-7505.

The current version of the ULF remains very similar to the 1946 version. *Compare* 1946 ULF, *with* PCC

7.14.005 - 7.14.130. The rates have changed over time, and the adjustments and exceptions made in the definition of "gross revenues" have changed, but the basic structure of the law remains the same: It applies to specified utilities doing business in the city, imposes a license requirement and a tax on revenues earned within the city, and it credits payments to the city made under permits or franchises. PCC 7.14.005 - 7.14.130.

Before June 1990, the ULF was calculated as five percent of "gross revenues," which were defined for telecommunications utilities to exclude revenues from "service other than noncompetitive local exchange telecommunications access service," PCC 7.14.020(a) (1985) (Portland Ordinance 157530 (June 2, 1985)). In June 1990, when ORS 221.515 was about to take effect on July 1, *see* Or Laws 1989, ch 484, § 9, the city amended the ULF as it applied to telecommunications utilities. The city changed the revenue base and tax rate for telecommunications utilities to match the revenue base and rate limits set out in the statute. PCC 7.14.040(D) (1990), PCC 7.14.060(A) (1990), (Portland Ordinance 163203 (June 27, 1990)). Thus, after the amendments, for telecommunications utilities, the ULF was seven percent of exchange access service revenue, rather than five percent of gross revenues as they were then defined. The amendments meant that, for telecommunications utilities, the revenue base and tax rate for the ULF and the privilege tax were identical.

In 2012, after the Supreme Court had decided *US West Communications v. City of Eugene*, 336 Or 181, 81 P3d 702 (2003) (*US West*), the city again amended the ULF, again changing the revenue base and tax rate. That is the version of the ULF at issue here. The amendments changed the tax for telecommunications utilities to five percent of gross revenues earned within the city, with a credit for fees paid under a permit or franchise, and "gross revenues" are no longer limited for telecommunications utilities to only exchange access service revenue. PCC 7.14.040(D), PCC 7.14.060, PCC 7.14.070 (Portland Ordinance 185756 (Nov 28, 2012)).

Before the amendments in 2012, the ULF was calculated in the same way that Qwest's permit fee and the

privilege tax were calculated: each was seven percent of Qwest's exchange access service revenue. Thus, the crediting provisions applied so that Qwest made only one payment of seven percent of exchange access service revenue to the city.

The 2012 amendment to the ULF that changed the revenue base raised the total amount of fees and taxes that Qwest was obligated to pay the city. Qwest's ULF obligation would exceed the amount of its permit fee, and Qwest would owe the city both the permit fee and the amount by which its ULF obligation exceeds its permit fee.

Thereafter, Qwest commenced this action to obtain a declaratory judgment that, among other things, ORS 221.515(1) preempted the ULF. The city filed a counterclaim for a declaratory judgment that, among other things, state law did not preempt the ULF. The gravamen of the dispute was, and remains, whether the city could increase the revenue base on which the ULF is calculated, which results in a greater tax obligation for Qwest.

The case was resolved by summary judgment. The city moved for summary judgment, and Qwest moved for partial summary judgment. The trial court denied Qwest's motion for partial summary judgment, granted the city's motion, and issued a final judgment in the city's favor, ruling that state law did not preempt the ULF. The court was not persuaded by Qwest's argument concerning the nature of the ULF and, therefore, rejected Qwest's contention that the ULF was a privilege tax on Qwest's use of the city's rights-of-way that was subject to the limitations of ORS 221.515.

## II.   ANALYSIS

In its appeal of the judgment, Qwest assigns error to the trial court's declaratory ruling that the ULF does not violate the statutory cap on taxes for the use of rights-of-way contained in ORS 221.515. We review declaratory rulings for legal error. *IAFF, Local 3564 v. City of Grants Pass*, 262 Or App 657, 661, 326 P3d 1214 (2014).

Qwest argues that the ULF is preempted by ORS 221.515. It contends that the ULF is in reality a privilege

tax, a tax for the use of the city's rights-of-way, which must therefore conform to the requirements of ORS 221.515(1) when applied to telecommunications carriers such as Qwest. In support of that argument, Qwest asserts that the ULF should be interpreted in light of its function rather than its nomenclature, relying on cases such as *Automobile Club v. State of Oregon*, 314 Or 479, 493, 840 P2d 674 (1992) (stating that "the character of a levy is determined by its function, not by the label"). Qwest argues that, because the ULF applies only to utilities that use the city's rights-of-way, it necessarily is a tax for that use, and is therefore a privilege tax subject to the statutory limits. Qwest also argues that the legislative history proves that the legislature "understood and intended" that ORS 221.515 would limit the ULF.

The city counters that ORS 221.515, as interpreted by the Supreme Court in *US West*, places limits on a city's authority to tax telecommunications carriers' use of rights-of-way, but it does not limit a city's ability to impose additional taxes on those carriers for other purposes. The city argues that, properly construed, the ULF is not a tax for use of its rights-of-way, and that, to the contrary, "nearly half the utilities currently subject to the ULF do not occupy any City streets, alleys, or highways."

In reply, Qwest argues that *US West* is irrelevant to this case, because the tax at issue in that case was significantly different from the ULF. Specifically, it points out that the tax at issue in *US West* did not apply solely to utilities that necessarily used city rights-of-way.

A. *Preemption Generally*

Qwest's claim of error requires us to determine whether ORS 221.515 preempts the ULF. Thus, we begin by examining how state law might preempt a local law enacted pursuant to a city's "home rule" authority. Under that framework, a local law is valid and not preempted if "'it is authorized by the local charter or by a statute,'" and if it does not "'contravene[] state or federal law.'" *Rogue Valley Sewer Services v. City of Phoenix*, 357 Or 437, 450, 353 P3d 581 (2015) (quoting *LaGrande/Astoria v. PERB*, 281 Or 137, 142, 576 P2d 1204, *adh'd to on recons* 284 Or 173, 586 P2d 765 (1978).

A state law can preempt a municipal law in two ways. First, the state might pass a law or laws expressly precluding all municipal regulation in an area, such that the state "occup[ies] the field" in that area. *Id.* at 454. Second, state law will preempt a municipal law if the laws conflict, such that they "cannot operate concurrently." *LaGrande/Astoria,* 281 Or at 148; *accord Advocates for Effective Regulation v. City of Eugene,* 160 Or App 292, 299, 981 P2d 368 (1999). When conducting that conflict analysis, we must construe the local law "if possible, to be intended to function consistently with state laws[.]" *LaGrande/Astoria,* 281 Or at 148.

Qwest does not argue that the city's actions exceeded its charter, nor does it argue that the legislature intended to occupy the field. Accordingly, this case reduces to the question whether the ULF conflicts with ORS 221.515(1), such that the two laws cannot operate concurrently. That requires us to interpret both the statute and the municipal law to determine if they can function concurrently or if they necessarily conflict. *LaGrande/Astoria,* 281 Or at 148-49. To that end, we first determine the meaning of ORS 221.515, and then we determine whether, properly interpreted, the ULF cannot be harmonized with that statute.

## B.   *ORS 221.515*

In determining the meaning of a statute, we examine its text and context, as well as any legislative history that is helpful to our analysis. *State v. Gaines,* 346 Or 160, 171-72, 206 P3d 1042 (2009). The goal of that inquiry is to determine the legislature's intent. *IAFF, Local 3564,* 262 Or App at 661.

The Supreme Court has previously construed ORS 221.515 in *US West.* That case provides useful context for the discussion here. The City of Eugene had imposed on telecommunications carriers a two percent annual registration fee in addition to the seven percent privilege tax permitted under ORS 221.515. *US West,* 336 Or at 183-84. US West sought a declaratory judgment that ORS 221.515 prohibited the two percent tax.[5] *Id.* at 184.

---

[5] US West later became Qwest. *US West,* 336 Or at 183.

The Supreme Court noted at the outset that "[t]he question is not whether ORS 221.515 authorizes the city to impose its two percent registration fee[,]" but rather, "whether state * * * law prohibits the city from doing so." *Id.* at 186. US West argued that, because "a telecommunications carrier cannot operate without using a city's rights-of-way," the statute's limitation on right-of-way privilege taxes applied to the City of Eugene's tax on the privilege of operating within the city, even though that tax did not refer to right-of-way use. *Id.* at 187. The court explained, however, that the statute was not as broad as US West's argument would require. *Id.* Rather, by its plain terms, ORS 221.515 limits taxes on "one narrow type of activity"—the privilege of using a city's rights-of-way—and it does not prohibit a city from imposing additional taxes or fees for other activities:

> "[T]he legislature focused only on a city's ability to recover a tax for one narrow type of activity, *viz.*, a carrier's use of the city's rights-of-way. The legislature said nothing about a city's ability to tax other business activities that a telecommunications carrier might undertake within the city limits. * * * [T]he legislature logically could choose to limit a city's ability to recover a tax for a carrier's use of its streets without also limiting a city's authority to recover other taxes or fees from carriers that do business within the city's borders."

*Id.* at 187-88. Further, the court noted that "ORS 221.515(1) states that cities may impose a tax for the privilege of using the city's streets, alleys, and highways; *it does not address whether a city may (or may not) impose a tax for the privilege of operating within city limits." Id.* at 188 (emphasis added).

Here, Qwest does not argue, as in *US West*, that the city is prohibited from imposing additional taxes on it beyond the privilege tax addressed in ORS 221.515(1), nor does it argue that the tax violates ORS 221.515(3). Rather, Qwest argues that the ULF *is* a privilege tax for the use of the city's rights-of-way, and that, as such, it is limited to seven percent of Qwest's exchange access service revenue under ORS 221.515(1). We focus our inquiry, therefore, on the terms of ORS 221.515(1) that define the taxes to which the statute's limits apply. *See Proctor v. City of Portland*, 245 Or App 378, 382-92, 263 P3d 1099 (2011), *rev den*, 351 Or 649

(2012) (resolving whether state law prohibited local business license tax by first examining relevant statutes, then examining municipal law at issue to determine whether state law prohibited it).

The "privilege taxes" that the legislature intended to limit are addressed in ORS 221.515(1). Again, that provision states, in relevant part:

> "The council of every municipality in this state may levy and collect from every telecommunications carrier operating within the municipality and actually using the streets, alleys or highways, or all of them, in such municipality for other than travel, a privilege tax for the use of those streets, alleys or highways, or all of them, in such municipality in an amount which may not exceed seven percent of the gross revenues of the telecommunications carrier currently earned within the boundaries of the municipality."

ORS 221.515(1). Accordingly, a "privilege tax" to which this limitation applies by its plain text is one that is (1) levied by a municipality, (2) upon a telecommunications carrier, (3) operating within the municipality, and (4) *actually using* the streets, alleys or highways for a purpose other than travel, and is (5) *for the use of the streets, alleys or highways.*

C. *The Text and Context of the ULF*

With those terms in mind, we next examine whether the ULF imposes a "privilege tax" on telecommunications carriers within the meaning of ORS 221.515(1), and is thus subject to the limitations in that provision. We begin with the relevant text and context of the city's code provisions. *See Lincoln Loan Co. v. City of Portland,* 317 Or 192, 199, 855 P2d 151 (1993) (applying statutory construction template to a municipal ordinance).

Portland City Code chapter 7.14, entitled "Utility License Law," sets out the provisions that make up the ULF. Under PCC 7.14.020, "[a]ny person, including any bureau of the City, operating a utility within the City shall obtain a license for such business * * *." The tax for that license for a telecommunications utility is five percent of its "gross revenues," PCC 7.14.060(A), which, with some exclusions not relevant here, include "any revenue earned within the City,"

PCC 7.14.040(D). That is, "gross revenues" include both exchange access service revenue and nonexchange access service revenue. Another provision defines "utility" as

> "the business of supplying electrical energy, gas, district heating or cooling, water, sewage disposal and treatment, cable, telecommunications, or other services through or associated with telephone or coaxial cable, and other operations for public service but does not include transportation service, railroad operations, or services otherwise licensed under this Title."

PCC 7.14.040(I). Finally, a provision defines telecommunications:

> "'Telecommunications' means the providing or offering for rent, sale or lease, or in exchange for other value received, of the transmittal of voice, data, image, graphic and video programming or any other information between or among points by wire, cable, fiber optics, laser, microwave, radio, or similar facilities, with or without benefit of any closed transmission medium, but does not include:
>
> "1. cable television services;
>
> "2. private telecommunications network services;
>
> "3. over-the-air radio or television broadcasting to the public-at-large from facilities licensed by the Federal Communications Commission or any successor thereto;
>
> "4. direct-to-home satellite service within the meaning of Section 602 of the Telecommunications Act of 1996;
>
> "5. services provided solely for the purpose of providing internet service to the consumer;
>
> "6. public safety radio systems;
>
> "7. mobile service within the meaning of 47 U.S.C. § 153(33) (2012) and
>
> "8. services to devices exclusively utilizing electromagnetic spectrum unlicensed by the Federal Communications Commission."

PCC 7.14.040(H).

By those terms and definitions, the ULF is a tax on the gross revenues of utilities—including telecommunications utilities—earned within the city. It makes no reference

to the use of "streets, alleys or highways," or rights-of-way, and, theoretically, its terms could apply to telecommunications utilities that use "laser, microwave, radio[,] or similar facilities." Thus, the ULF described in PCC chapter 7.14 is not structured as a privilege tax, as described in ORS 221.515.

That view of the ULF—as a tax based on gross revenues earned in the city—is supported by the context of PCC chapter 7.14. Another chapter of the city's code, PCC chapter 7.12, is devoted to permits, franchises, and taxes for using the city's rights-of-way. And, PCC 7.12.060 specifically imposes a privilege tax for "using or occupying" the city's rights of way. The existence of that separate code chapter and its provisions concerning the city's privilege tax indicates that the ULF provides for something different from a privilege tax. *See, e.g.*, *State v. Clemente-Perez*, 357 Or 745, 755, 359 P3d 232, 239 (2015) ("As a general rule, we * * * assume that the legislature did not intend any portion of its enactments to be meaningless surplusage." (Citing ORS 174.010.)).

D.  *Whether, Despite the Text of the City's Code, the ULF is a Privilege Tax*

Despite the text of the provisions in PCC chapter 7.14 set out above, Qwest contends that, in substance, the ULF is a privilege tax subject to ORS 221.515(1). The thrust of Qwest's argument is that the city assesses the ULF on utilities just like a privilege tax: The city assesses the ULF only if the utility uses city rights-of-way. The city challenges that argument on two fronts. First, the city asserts that Qwest's argument depends on flawed premises about how the ULF applies. Second, the city asserts that the argument as a whole fails as a matter of logic and of law: Even if it were true that the city assessed the ULF only on utilities that used or occupied the city's rights-of-way, that fact would not compel the conclusion that the ULF is, in fact, a privilege tax. As we explain, we are not persuaded that the ULF acts as a privilege tax.

First, Qwest argues that the ULF falls within the terms of ORS 221.515(1), as a privilege tax for the use of the city's rights-of-way, because "access to public rights-of-way

*itself* is the trigger for imposition of the ULF." Qwest notably frames this argument in terms of "access to" rather than the statutory language that refers to "actually using" the city's rights-of-way. Qwest acknowledges that the ULF applies to a number of utilities that are resellers of telecommunications services or are voice-over-internet-protocol (VOIP) providers. Those utilities—which are subject to the ULF, but not the city's privilege tax—do not own or operate equipment or facilities in the city's rights-of-way. The resellers purchase service from other utilities that unquestionably do "actually use" the city's rights-of-way, and they resell it to their customers. The VOIP utilities provide telephone service to customers who typically have internet service through another company. However, Qwest argues that those utilities do use cables and equipment located in the city's rights-of-way to provide services, so the fact that they are included in the sweep of the ULF is consistent with its position that the ULF is a tax on the use of the city's rights-of-way. Like the trial court, we disagree with Qwest's view of the ULF.

As explained above, the legislature intended that a tax levied on a telecommunications carrier would be limited to the tax rate and revenue base set out in ORS 221.515(1), if the tax matched the criteria set out in that provision. Those criteria again are that the tax is (1) levied by a municipality, (2) upon a telecommunications carrier that is (3) operating within the municipality and (4) *"actually using"* the streets, alleys, or highways for a purpose other than travel, and the tax is (5) *"for the use of"* those streets, alleys, or highways. (Emphases added.) Here, the ULF matches the first three statutory criteria, but not the fourth and fifth.

As for the fourth criterion, Qwest's position would require us to conclude that the phrase "actually using" in ORS 221.515(1) includes indirect use by telecommunications resellers and VOIP providers. We conclude that it does not. The word "actually" means, as relevant here, "in act or in fact : REALLY" and is contrasted with "nominally."[6] *Webster's*

---

[6] The full definition provides:

"**1** : in act or in fact : REALLY <nominally but not ~ independent —Karl Loewenstein> **2** : at the present moment : for the time being <the transmission screen showing the picture that was ~ on the air —Dennis Johnston>

*Third New Int'l Dictionary* 22 (unabridged ed 2002). In context, then, a tax to which ORS 221.515(1) applies is one imposed on telecommunications carriers that in fact, really, and not just nominally, use the city's rights-of-way.

But the telecommunications resellers and VOIP providers do not in fact, really, and not just nominally, use the city's rights-of-way. Rather, to the extent that they do "use" the city's rights-of-way, they do so indirectly by either purchasing service from another utility and reselling it or by providing service to a customer who has existing internet access.

Thus, to reach the conclusion Qwest proposes, we would have to ignore the word "actually" in the legislature's phrase, "actually using." We cannot conclude that the legislature intended the word "actually" in ORS 221.515(1) to be meaningless. *See* ORS 174.010 (in construing a statute, a court is not to "insert what has been omitted, or to omit what has been inserted"); *US West*, 336 Or at 188 ("We cannot adopt the interpretation of ORS 221.515 that US West urges without rewriting the statute's terms, a task that we cannot undertake."). Further, we cannot conclude that the legislature intended to limit the taxation powers of home rule cities in the way that Qwest claims when that conclusion would require us to ignore a part of the statute that is the expression of the legislature's intent.

Similarly, we are unconvinced that the ULF is directed at an activity other than what it says: utilities doing business within the city. Qwest asserts that all of the utilities to which the ULF applies supply services through wire, pipe, conduit, or cable in, on, or over city streets. It follows, Qwest argues, that (1) the city imposes the ULF only on utilities that actually use city rights-of-way and (2) the ULF is therefore a privilege tax for the use of those rights-of-way and is subject, insofar as it applies to telecommunications carriers, to the limits in ORS 221.515(1).

For its argument that the tax applies only to utilities that actually use city rights-of-way, Qwest relies in

---

**3 :** in the point of fact **:** in truth—used to imply that one would expect the fact to be the opposite of what is stated <she ~ spoke Latin>[.]"

part on its interpretation of PCC 7.14.040(I), which defines a "utility" for purposes of the ULF. Qwest asserts that PCC 7.14.040(I) "describes a telecommunications 'utility' as a 'business * * * supplying * * * telecommunications, or other services[,] through or associated with telephone or coaxial cable.'"

But Qwest's position is based on a misreading of the city's code. The definition of a utility in PCC 7.14.040(I) lists separate business activities in which a utility might be engaged, and those activities are separated by commas. Thus, a "utility" includes businesses supplying "telecommunications," and also those supplying "other services through or associated with telephone or coaxial cable," just as it includes businesses supplying "water," and those supplying "sewage disposal and treatment." Qwest misreads the phrase "through or associated with telephone or coaxial cable" as modifying "telecommunications" rather than "other services." That Qwest is misreading PCC 7.14.040(I) is made even more evident when one considers the definition of "telecommunications," which immediately precedes the definition of "utility." PCC 7.14.040(H). "Telecommunications" is defined as including "transmittal of voice, data, image, graphic and video programming * * * by * * * fiber optics, laser, microwave, radio, or similar facilities," *id.*, which are clearly not supplied "through or associated with telephone or coaxial cable."

Qwest next points out that the definition of "telecommunications" excludes various services—PCC 7.14.040(H) (1-8), for example, excludes direct-to-home satellite service—all of which Qwest describes as non-wireline-based services. Qwest also highlights that the city has implemented an administrative rule exempting wireless communications providers from the ULF:

> "All providers of wireline voice telephone and communications services to subscribers in the City of Portland, whether by means of provider-owned facilities or facilities owned by another, including voice services delivered through the use of Internet Protocol, are required to obtain a Utility License * * *. The Utility License Law does not apply to wireless communications or telephone providers, nor to such providers paying compensation to the City on

a linear foot basis under the terms of a valid franchise, license or permit."

*Former* Portland Administrative Rule UTIL-UFM 1.04 (2009), *renumbered as* Portland Administrative Rule UTL-3.04 (2010), *renumbered as* UTL 3.05 (2011). According to Qwest, the exclusions in the definition of telecommunications and the exemption of wireless communications providers in the administrative rule reinforce its argument that the ULF is right-of-way based, because the only telecommunications services that are subject to the ULF are wireline-based services for the transmission of communications.

However, while the city in fact does not apply the ULF to wireless communications providers, it does apply the ULF to telecommunications utilities that deliver services though "facilities owned by another." *Id.* Thus, as discussed earlier, resellers and VOIP providers that do not occupy the city's rights-of-way must pay the ULF. The city adduced evidence that, at the time of the summary judgment proceedings, 71 of the 151 utilities that were paying the ULF did not occupy city rights-of-way.

In addition, Qwest does not controvert the city's evidence that wireless communications companies do use city rights-of-way for their equipment. Those companies have "right of way agreements," which are franchises that allow them to place equipment in city rights-of-way, and they pay a rate per fixture. Thus, because wireless communications companies do use and occupy the city's rights-of-way, the exclusion of those companies does not show that use of the city's rights-of-way is the "trigger" for application of the ULF to a utility, and therefore that the ULF is a tax for the use of city rights-of-way, as Qwest contends.

Qwest also argues that the provisions of the ULF that provide credit for payment of the privilege tax and permit fees—which are payments for use of the city's rights-of-way—prove that the ULF is also a tax on right-of-way use. As the trial court correctly pointed out, however, a tax credit of one tax payment against another tax owed "does not cause the character of the first tax to define the character of the second tax."

Qwest also points to the legislative history of ORS 221.515 as supporting its contention that the ULF was and is a privilege tax subject to the limitations in that statute. Qwest argues that the legislature "understood and intended" that ORS 221.515 would limit the ULF given the participation of both Qwest's predecessor, US West, and the city during the legislative process that led to passage of Oregon Laws 1989, ch 484 (HB 3000) and the enactment of ORS 221.515. According to Qwest, "the Oregon legislature itself explicitly intended to target the ULF when it passed HB 3000, which became ORS 221.515." (Emphasis omitted.)

In support of that contention, Qwest asserts that, before passage of HB 3000, Qwest's predecessor, US West, had for "some years" been paying the ULF as "the sole assessment actually levied" by the city.[7] The city's increase of the ULF tax rate from three percent to five percent in 1985 prompted Qwest to lobby the legislature for the restrictions on local taxes that became HB 3000. The city and Qwest both participated in the legislative process. After engaging in negotiations, they made a joint recommendation to the legislature that the tax limitation in HB 3000 should be set at seven percent of exchange access service revenue. In addition, Qwest points to references by the city, including in its amendment in 1990 of the ULF, as showing that the city at those times regarded ORS 221.515 as applying to the ULF.

The city responds that the legislature's intent in enacting ORS 221.515 has already been determined by the Supreme Court in *US West*. That intent was to limit only "a city's ability to recover a tax for one narrow type of activity, *viz.*, a carrier's use of the city's rights-of-way." *US West*, 336 Or at 187. The *US West* court further explained, the city points out, that the legislature's intent when it limited taxes for the use of streets, alleys, and highways, could not be read as intending to create a broader prohibition.

In addition, the city notes that *the city's* understanding of the reach of ORS 221.515 does not demonstrate the intent of *the legislature* in enacting it. Even if the city's

---

[7] Qwest's assertion of fact is not accompanied by a citation to the record. *See* ORAP 5.20(1). Because it would not compel a different result, we assume that the record does contain evidence of that point.

beliefs about the law were relevant, the city argues, the fact that, after passage of HB 3000, the city amended both the ULF and its privilege tax "showed, at most, that the City may have believed—as did many others at the time—that ORS 221.515 might limit numerous kinds of taxes on utilities, not just" taxes for the use of cities' rights-of-way. Citing *US West*, 336 Or at 187 (explaining that US West argued that ORS 221.515 "caps a city's ability to recover [any] tax for the privilege of operating within the city"), the city points out that, until the *US West* decision, that was Qwest's belief as well.

We are not persuaded by Qwest's legislative history argument. The testimony that Qwest cites to us contains numerous references to local privilege and franchise taxes and fees. We have found only one passing reference in those materials, however, that is arguably a reference to the ULF. That reference is by US West's lobbyist. We provide it in context:

> "The current statutes that we're talking about dealing with here today date back to the 1930s. During our discussion, we will use the terms 'franchise taxes' and 'privilege taxes' kind of interchangeably. And it really doesn't make any difference for the sake of discussion, I don't believe, because what we're really talking about is the tax authorized by ORS 221.450.
>
> "For decades cities have levied franchise or privilege taxes on local phone companies *for the privilege of conducting business within the cities* and the use of city streets and alleys for their openings and construction of their facilities and so on."

Tape Recording, Senate Government Operations and Elections Committee, HB 3000, June 7, 1989, Tape 141, Side A (statement of Gary Wilhelms, Director of Legislative Affairs, US West (emphasis added)). The statute Wilhelms referenced, ORS 221.450, limits local privilege taxes—taxes "for the use of * * * public streets, alleys or highways"—on utilities generally. That statute previously set the limits on privilege taxes applicable to all utilities, including telecommunications carriers, until passage of HB 3000 created a separate limitation for telecommunications carriers. That single reference to taxes "for the privilege of conducting

business within" a city by US West's lobbyist, in context, does not persuade us that the legislature "understood and intended" that references to taxes on the actual use of city streets, alleys, and highways, would include taxes on conducting business within the city generally. Nor are we persuaded that the legislature "expressly intended to target the ULF."

Having examined the legislative history that Qwest points to as supporting its position, we conclude that it is not helpful in determining the legislature's intent. It does not lead us to any meaning other than that found in the plain text. Further, we find no ambiguity in the plain text. And, even if a part of the legislative history revealed an intention to target the ULF—which we do not find—we still would not, in effect, rewrite an unambiguous statute contrary to its unambiguous plain text. *Halperin v. Pitts*, 352 Or 482, 494-95, 287 P3d 1069 (2012) ("It is one thing to resort to legislative history to resolve an ambiguity" in a statute, but "[i]t is another thing entirely * * * to resort to legislative history as a justification for inserting wording in a statute that the legislature, by choice or oversight, did not include.").

Citing *Proctor*, 245 Or App 378, Qwest argues that we should view the 2012 amendments to the ULF as an attempt by the city to sidestep the limitations in ORS 221.515(1), by making changes to the provision while claiming a particular intent, but not fundamentally changing the substance of the provision. In *Proctor*, we concluded that a state statute prohibiting cities from imposing business license taxes on real estate brokers working under the supervision of a principal real estate broker precluded the City of Portland from enforcing an amended version of its business license tax. 245 Or App at 390-92. There, we undertook a similar analysis to the one we engage in here, first determining the intent of the legislature in enacting the prohibition, and then examining the city code provision to determine if it conflicted with the statute.

In *Proctor*, the statute at issue had a very broad sweep, defining a business license tax as including "*any fee* paid by a person to a city or county for *any form* of license that is required by the city or county in order to conduct business

in that city or county." ORS 701.015(6)(a) (emphases added). In addition, the legislature had created an exemption for the business license tax at issue in another, related statutory provision, but it had not exempted that tax from the provision at issue in *Proctor.* 245 Or App at 390-91. The legislature had in fact contemplated whether the statute would limit the business license tax, and it had declined to exempt it. We held that, although the city had cosmetically altered the code provision that was previously clearly prohibited by the terms of the statute, the amendments had not succeeded in creating a provision that would fall outside of the statute's broad definition of a business license tax. *Id.* at 391-92.

Qwest's argument here is premised on its contention, as discussed above, that the ULF was previously a privilege tax clearly subject to the limitations in ORS 221.515, and thus, because the 2012 amendments did not fundamentally alter the ULF, they did not succeed in removing it from the limitations of the statute. We have already rejected that contention. As explained above, ORS 221.515(1) is a limit "only on a city's ability to recover a tax for one narrow type of activity." *US West,* 336 Or at 187. The statute does not limit a city's authority to impose additional taxes on utilities, such as a tax for the privilege of doing business within the city.[8] And, even if the city may have believed, before *US West* was decided, that the ULF might be subject to the limitations in ORS 221.515, that does not mean that it actually was. Thus, although we agree that the 2012 amendments did not fundamentally alter the nature of the ULF, we reject Qwest's premise that the ULF was previously a privilege tax subject to ORS 221.515(1), so the amendments did not need

---

[8] The legislature did use a broader term in a-related provision found in a different section of the act. Or Laws 1989, ch 484, §§ 5, 7. The related provision concerns how the Public Utility Commission should treat certain local exactions for rate-making purposes. Or Laws 1989, ch 484, § 7. That section of the act was codified as *former* ORS 759.105 (1990), *renumbered as* ORS 759.219 (2005). ORS 759.219 refers to "[t]he privilege tax authorized by ORS 221.515, *or other similar exactions* imposed by any municipality in this state upon telecommunications utilities for use and occupancy of streets, alleys or highways, or all of them[.]" (Emphasis added.) That the legislature used a broader term in a related provision, but not in the provision creating ORS 221.515, reinforces the conclusion that the limitations in ORS 221.515 apply to taxes that fit the narrow description in ORS 221.515(1) and not to a broader set of "similar exactions * * * for use and occupancy of streets, alleys or highways or all of them" described in ORS 759.219.

to fundamentally change the ULF's nature for it to continue to fall outside of the scope of the statute's limitations.

We conclude that the ULF does not conflict with ORS 221.515(1), because it is not a privilege tax for the use of the city's rights-of-way as contemplated by that statute. Consequently, we affirm the judgment of the trial court.

Affirmed.